# Fleming v. John Wanamaker Philadelphia, Inc.

386

*B. Nathaniel Richter*, for plaintiff.
*Harold Scott Baile*, for defendant.

BOK, P. J., December 22, 1941.—There was a verdict of $750 for plaintiff, but we subsequently entered judgment for defendant n. o. v.

Plaintiff fell through a trap door set in the ceiling of the twenty-fourth story of the Lincoln - Liberty Building in Philadelphia. This is the top office story of the building. Between its ceiling and the floor of the twenty-fifth story there is an air-space about four feet thick. The twenty-fifth and twenty-sixth stories contain machinery, and their floors are pierced by trap doors, of which there is a pair sunk in the floor of each story: these doors open upwards, and each one of the two doors forming a pair is hinged at the outer edge so that the doors open away from each other at the middle. The doors set in the ceiling of the twenty-fourth story, however, are similarly hung but open downwards, and their hinges are concealed. When all three pairs of doors are open, a chain hoist located near the ceiling of the twenty-sixth story permits machinery to be lowered onto the floor of the twenty-fourth story and put on the main elevators, which run no higher than the twenty-fourth story: the trap doors, in short, are in line in order to allow such passage.

When the doors in the floor of the twenty-fifth story are raised and the doors in the ceiling of the twenty-fourth story are lowered, the air-space between them is a square hole no wider or longer than the doors and about four feet high, as though the ceiling of the twenty-fourth story were four feet thick. Around the bottom of this air-space and within it is a metal mold-

ing that runs around the four sides. When closed, the doors in the ceiling of the twenty-fourth story fit against this molding and prevent their opening upwards into the air-space. A similar molding at the top of the air-space prevents the doors in the floor of the twenty-fifth story from opening downwards into the air-space. Standing on the twenty-fifth story and looking down into the air-space when the lower doors are closed, the floor of the air-space, formed by the closed doors, appeared smooth at the time of the accident and was devoid of handles, eye-bolts or any kind of protruberance. Standing on the floor of the twenty-fourth story and looking up at the doors in the ceiling, there can be seen four latches, two on each door; by pulling down the lever, a hidden catch, which apparently engages in the wall, is withdrawn and the doors can be opened. There are also four circular eyelets screwed onto the doors near the latches.

These ceiling doors are located over the spot where the lobby in front of the twenty-fourth story elevators meets at a right angle the corridor leading to the offices. The doors cannot be swung back flat against the ceiling, as one would come up against a girder and the other against a light. Furthermore, the wall of the corridor slants in such fashion that a corner of one door would strike the wall if it swung downward materially past the perpendicular. This happened when the accident occurred, and a small hole was still visible in the marble with which the wall is lined.

The evidence shows that plaintiff was sent with some fellow-workmen by the Otis Elevator Company, an independent contractor, to repair or remove some elevator machinery from the building. They first went to the twenty-fifth and twenty-sixth stories and opened the floor trap doors there. They then returned to the twenty-fourth story, believing that the ceiling doors there also opened upwards as the others had done. Someone released the latches but the doors did not move

down. The building is 10 years old and the doors had never been opened. The workmen then got a stick of three by six lumber, padded the end, and several of them pushed it hard against the doors, but after several attempts the doors still did not budge. It apparently did not occur to anyone to insert a finger or a hook in the circular eyelets and pull the doors down, and assuming that they opened upwards plaintiff was sent to the twenty-fifth story to see what was wrong. The lighting conditions were good, but the light on the twenty-fifth story was not located directly over the air-space, where it would have been in the way of the chain hoist, but was hung several feet away and so cast its illumination obliquely in such a way that most of the air-space was in darkness.

Plaintiff got a flashlight, which he said was "very weak". It made a circle of light 18 to 22 inches in diameter, but it was so feeble that he could not see the molding at the bottom of the air-space, nor could he see the division line between the doors, which, of course, ran the whole length of the air-space. When asked if he could see the bottom molding, plaintiff testified, "I didn't see that. I couldn't see it. The flashlight was very weak. I flashed the light all around. I assumed that the doors opened up." In 18 years of experience they were the first doors he ever saw that opened down.

Despite his unsuccessful effort to see into the dark air-space, plaintiff lowered himself into it and when his feet touched the doors and he put his weight on them, the doors flew open and he shot through onto the floor of the twenty-fourth story.

We pass the question of defendant's negligence, alone or as affected by the presence of the independent contractor, for we are of opinion that plaintiff was clearly guilty of contributory negligence. Regardless of his 18 years' experience, he had no right to assume anything about these doors without testing them in a way that involved no danger to himself. The fruit-

less attempt to push the doors upward with a heavy piece of lumber should have presented to his mind the possibility that if the doors wouldn't go up when pushed against so hard, they might come down when pulled. He saw the eyelets, but assumed they were placed there for the insertion of rods to hold the doors back against the wall of the air-space: just as easily he could have assumed that the eyelets were there to be pulled from below. Having seen these things, he then went up to the floor above, and after using a light which he admits was too weak to show him anything he lowered himself into the darkness, apparently to find out what he could by the sense of feel. A stronger light would have revealed the molding at the bottom of the air-space. Since he was sent up to find out what was wrong, and since his flashlight was incapable of giving him the answer, he was simply exploring when he let himself down into an unknown situation. His assumption of safety, based on experience with other doors, is not the equivalent of due care in approaching these particular ones.

We can find no case even reasonably close on the facts. Plaintiff refers us to section 343, comment *d*, of the Restatement of Torts, which permits a business invitee to rely upon the owner to keep the premises safe or to notify him of known defects. This is inapposite, since it assumes a defect, and there is none here. There was nothing wrong with the doors. Granted they did not fall when the latches were released, there is no evidence that anyone tried to pull them down. Plaintiff's assumption that they opened up appears to be based on the belief that if lowered the doors would strike the wall, although in another part of his testimony he specifically denies wondering about which way they did open. Even if he had considered it, he could have seen that the door would have to swing substantially past the perpendicular before striking the wall. He also stated that Mr. Schaeffer, the building superintendent,

didn't know which way the doors opened, although it is not clear that he was asked about it. Granted, arguendo, that it was negligent of defendant not to put up a sign telling how the doors opened, this does not render the doors defective, within the meaning of the Restatement. It simply reveals a situation where a man failed to take sufficient care to find out how a piece of mechanism worked before putting himself in a dangerous position with relation to it. A different question might be presented if plaintiff and his fellow-workmen had tried to pull the doors down as hard as they tried to push them up, but a fair reading of the testimony shows that the alternative of the doors opening downwards never occurred to anyone, or that if it did no one acted on it.

Plaintiff cites Murphy v. Bernheim & Sons, Inc., 327 Pa. 285 (1937), as analogous. This was the case of a man falling down an elevator shaft in a dim light which created an optical illusion that the elevator was there when in fact it wasn't. The instant case is distinguishable because when plaintiff lowered himself into the air-space he did so without knowing what was there. Since the flashlight was too weak to show anything, he might as well not have used it at all, for he was no better off after using it than before.

We believe that the dark elevator shaft cases are sufficiently close to warrant the reliance of analogy. See Hoffner et ux. v. Bergdoll, 309 Pa. 558 (1933), and Modony v. Megdal, 318 Pa. 273 (1935). It is not so much a question of how much light there is but of whether the amount of light available creates some illusion that might confront any reasonable man. If the lighting conditions do not create such an illusion but successfully hide a dangerous condition or the evidence of it, we believe that a person who commits himself to the darkness, complete or partial, without taking adequate steps to dispel it takes a chance. An unsuccessful explorer cannot be a successful plaintiff. Our plaintiff did not assert that the lighting conditions

misled him. What did mislead him was his own un-warranted assumption that the doors opened upwards.